IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GRAIN PROCESSING CORPORATION | : | |
| | : | Case No. 09-CV-1163 |
| Plaintiff, | : | |
| | : | Judge Watson |
| vs. | : | Magistrate Judge King |
| | : | |
| GREIF PACKAGING, LLC | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFF GRAIN PROCESSING CORPORATION'S
REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

> Visit to plant to remove Top AP AE12 (200807350410) installed 11-20-1009. ***Customer has been fighting a bonding problem on the edges of board since this belt was installed.*** See service reports for the following dates Jan. 15, 17 and Feb. 27. ***At customer request we removed the belt and installed the old AP AE12 (200708323411) and all bonding problems disappeared.***  I can not [sic] explain the reason for the drastic improvement in board quality. We will ask MSD for an explanation as to what has happened. We suspect the belt was not moving moisture from the board keeping the starch from curing on the edges. . . .

(Aman Dep. Ex. 70) (emphasis added)[1]  The quoted language is from a May 4, 2009 report from Combined Containerboard's corrugating machine service provider, months after Defendant began experiencing production issues it attributed to Grain Processing's starch—and months after Defendant quit using that starch.  Despite this report, Defendant asks this Court in effect to find as a matter of law that Grain Processing's pearl starch caused Defendant's delamination issues

---

[1] Unless otherwise noted, deposition transcripts and exhibits have previously been filed in support of Plaintiff's Motion for Summary Judgment [ECF Doc. 41] or Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [ECF Doc. 55], and Grain Processing incorporates them herein.

1

during late 2008 and early 2009, simply dismissing the above report as wrong, and to base its rulings on the cross motions for summary judgment accordingly.

But it is undisputed that the service provider reported the bonding problem Combined Containerboard experienced during the relevant time frame ***was the result of the machine***. (Aman Dep. 176)  Moreover, as explained before in previous briefs, starch from the very same lots sent to Combined Containerboard and Multicorr also went to Michigan Packaging, which had no complaints. (Barnes Dep. 26–28; Gregory Aff. in supp. Plf. Mot. Summ. J. ¶ 4 [ECF Doc. 41] (three lots during the time frame were shipped to Michigan Packaging and Combined Containerboard or Multicorr, among other customers; virtually all pearl starch shipped to Defendant during the time frame came from the same facility))

When all of the undisputed facts, not just those hand picked by Defendant for the Court's consumption, are considered, Grain Processing is entitled to summary judgment on Defendant's claims as well as its own claim.

I. **Grain Processing Is Entitled To Summary Judgment On Defendant's Breach Of Express Warranty Claim.**

Defendant claims that Grain Processing provided pearl starch that was not fit for its use, speculating in the face of evidence such as the above report that Grain Processing's pearl starch was the sole cause of Defendant's delamination issues.  However, undisputed facts show that Grain Processing's starch met Defendant's needs.  Even if it had not, Defendant did not provide Grain Processing with a full opportunity to cure any deficiencies. (See detailed evidence relating to starch meeting both parties' applicable specifications at pages 16–17 of Plaintiff's Motion for Summary Judgment [ECF Doc. 41]).

Further, it is undisputed that Defendant rejected certain of Grain Processing's efforts to investigate Defendant's allegations of faulty pearl starch.  Grain Processing was not given an

2

opportunity to adjust the adhesive formula itself.  Grain Processing requested opportunities to run trials that might enable it to isolate the problem, and it was not permitted to do so.  (Krumm Dep. 212, 222; Aman Dep. 209–11)

Attempting to maintain this claim, Defendant cannot overcome the undisputed evidence that the product met both parties' specifications, so instead it seeks to paint a picture of incompetence and disorganization at Grain Processing, but in no case does Defendant offer admissible evidence in support of any aspect of this picture of Grain Processing, and often is so selective in its references to the record so as to mislead:

1. Defendant offers deposition testimony to purportedly show flaws in Grain Processing's pearl starch testing procedures and charges Grain Processing's then Quality Assurance Coordinator, Melea Kluemper, with ignorance of the company's testing specifications (Def. Mem. Opp. Plf. Mot. Summ. J. p. 3–4 [ECF Doc. 54]).  This testimony is provided without the following context:  Ms. Kluemper in fact testified in detail about the company's process for testing pearl starch.  (Kluemper Dep. 30–52)  Regarding the reasons for particular specifications, she testified in response to questioning from Defendant's counsel:

> Q. Who does set the spec for that test?
> A. I'm not sure initially who proposed that limit, but when a new manufacturing spec or a revised manufacturing spec is proposed, it goes through corporate quality, the chemists at both labs, and production. Everyone -- and sales. Everyone has to sign off on it.
> Q. When did the -- was the caustic/borax RVA test in place when you started in 1999?
> A. Yes.
> Q. And was the spec the same then as it is now, [. . .]?
> A. As far as I know. I don't remember it ever changing.
>
> . . . . .
>
> Q. Has it not gone through the process by which sales agrees, the chemists agree, production agrees? Is that why it's not officially a spec in the LIM system?  Do you know?

3

>A. I'm not sure.
>Q. But all other specs that become a manufacturing spec go through that process; everyone has to agree and then it gets set as a spec?
>A. Yes.

(Kluemper Dep. 54–55, 67) Ms. Kluemper is clearly familiar with any information asked of her about the specifications, so it misrepresents Ms. Kluemper's testimony to say she has no knowledge about why or how specifications are set. (See, e.g., Def. Mem. Opp. Plf. Mot. Summ. J. p. 3 [ECF Doc. 54])[2]

2. Defendant is similarly selective regarding the testing done on samples of starch received from a customer, which it claims demonstrate unacceptable caustic sensitivity. (Def. Mem. Opp. Plf. Mot. Summ. J. p. 4 [ECF Doc. 54]) Grain Processing's then Associate Scientist, Rich Hitchcock, freely acknowledged in deposition that he may not have correctly performed one particular test regarding caustic sensitivity on product. However, it is undisputed that his error would have resulted in a false positive for caustic sensitivity, i.e., identified a problem that did not truly exist. Extensive further testing and rechecks did not reveal a problem. (Hitchcock Dep. 9, 114–17 ("They took the same starch and waited about 30 seconds to get it all slurried, stirred it for five minutes and got an answer 20 mls higher, which would have a false positive. It went on to mention that that particular test, it's very easy to get a false positive. . . .I can say, from all the other testing that I did on the samples, it didn't appear that there were caustic sensitivity issues after the rechecks were performed."))

3. Also unburdened by any supporting testimony is the purported picture of disorganization at Grain Processing during the relevant time period due to a labor dispute at

---

[2] Defendant also takes issue with the fact that Grain Processing's quality department personnel do not visit corrugating plants, but Grain Processing employs field technicians to be the experts in this area. (Hitchcock Dep. 11–12) In this regard it bears noting that Defendant's proffered expert has not visited a corrugating plant since 1988, and he has never been in a starch plant. (Meirowitz Dep. 17–18, 49) Excerpts from Dr. Meirowitz's transcript upon which Grain Processing relies are being filed contemporaneously herewith. Grain Processing is also filing a Motion to Seal excerpts of his transcript and plans to file the full transcript under seal should the Court grant said Motion.

4

Grain Processing's Muscatine, Iowa plant. (Def. Mem. Opp. Plf. Mot. Summ. J. p. 6 [ECF Doc. 54]) Muscatine was not even the plant manufacturing product for Defendant during the relevant time frame; rather, that product came from Washington, Indiana. (Gregory Aff. in supp. Plf. Mot. Summ. J. ¶ 4 [ECF Doc. 41]) Dennis Brooke even testified he thought production improved during the labor dispute. (Brooke Dep. 28 ("Quality and shipments improved. . . . Because people that had a vested interest in the company -- that is, salaried jobs, profit sharing, so on, so forth -- cared."))

Grain Processing does not dispute that Combined Containerboard experienced delamination issues, and only for purposes of summary judgment, it does not dispute that Multicorr did as well.[3] The evidence, however, cannot support a finding as a matter of law that Grain Processing's starch caused the delamination issues. Indeed, it is impossible to fathom how Defendant can label Grain Processing "intellectually disingenuous" in this regard (Def. Mem. Opp. Plf. Mot. Summ. J. p. 6 [ECF Doc. 54]) in light of:

- Grain Processing's before and after market testing results;
- Defendant's own testing results; and
- the report quoted at the outset of this brief unambiguously attributing the end of the delamination issues—long after Grain Processing's starch was no longer in use—to unrelated mechanical issues.

Leaving aside the credibility issues with Defendant's witnesses that are not decided at summary judgment, there is undisputed evidence that negates any genuine issue of material fact.

---

[3] Defendant again misrepresents the testimony of a Multicorr employee, Rod MacNail, with respect to the time frame in which Multicorr allegedly stopped experiencing delamination issues. Defendant claims Mr. MacNail testified the problems went away in mid-March 2011. (Def. Mem. Opp. Plf. Mot. Summ. J. p. 5 [ECF Doc. 54]) Mr. MacNail specifically testified the issues diminished in mid-March *to early April, 2009*. (MacNail Dep. 30, 65 ("When do you think, approximately, the problems started to -- the increased delamination started to go back down to what you would consider normal levels? A. What I recall is somewhere mid-March to early-April, in that time it started decreasing."))

With respect to Multicorr, its then First Shift Supervisor stated that the issues diminished in mid-March to early April. (MacNail Dep. 13, 30, 65) Multicorr received its last shipment of pearl starch from Grain Processing on February 24, 2009. (Aman August 19 Dep. 41) With respect to Combined Containerboard, its service provider in its report indicated that the issues continued until May 4, 2009, when the company switched to a previous corrugating belt. (Aman Dep. Ex. 70)

And, most importantly, there are multiple communications from Defendant during the relevant time period showing that it was looking for a way to get out of the starch price to which it had contractually committed. Given Defendant's insistence that its actions were motivated solely by quality issues and not by the fact that it had entered into a contract that it found unappealing when markets conditions changed, it bears repeating that:

- Beginning in September 2008, with the corn market going down, Defendant began to express concerns about the cost of starch to be supplied by Grain Processing pursuant to the terms of the 2009–2010 Supply Agreement. (Ludwig Dep. 134–35)

- In December 2008, Michigan Packaging became aware of the contract entered into by Brett Ludwig, Greif Regional Sourcing Manager for North America, and communicated to Grain Processing Technical Salesman Denny Brooke that Defendant was "screwed." (Barnes Dep. 51–52 & Ex. 121)

- On January 20, 2009, Mr. Ludwig contacted Grain Processing Director of Sales-Industrial Products Bill Somers to ask for a reduction in transportation costs. (Ludwig Dep. 147–49 & Ex. 35)

- Combined Containerboard Production Manager John Aman admits that on January 22 and 27, 2009—approximately a month before Defendant informed Grain Processing

6

that it intended to change suppliers due to alleged quality concerns—he received price quotes from Corrugated Chemicals for that company to supply pearl starch to both Combined Containerboard and Multicorr for the remainder of 2009. (Aman Dep. 197–204 & Ex. 74–75; see also Ludwig Dep. 155–56 & Ex. 37)

- On February 2, 2009, Multicorr's Plant Manager sent an e-mail to various colleagues comparing a quote received from Corrugated Chemicals (to replace the contracted Grain Processing starch) to what Defendant was paying for Grain Processing starch. (Ludwig Dep. 156–59 & Ex. 37)

- In a telling internal email, during the very time period Combined Containerboard alleges it had problems with Grain Processing's pearl starch, Vice President of Manufacturing for Corrchoice (Greif) Chris Krumm reported to his colleagues that the price quotes received from Corrugated Chemicals were "not enough to make a change." (Krumm Dep. 196–97 & Ex. 74)

- In March 2009, Defendant discussed with another of its starch suppliers revisiting the agreed upon price for 2009 and 2010. That supplier, Corn Products, did agree to renegotiate. (Ludwig Dep. 181–82)

Defendant also makes much of other alleged customer issues during the time frame. (Def. Mem. Opp. Plf. Mot. Summ. J. p. 7 [ECF Doc. 54])  But these issues are distinct and different from the issues asserted by Defendant, and Defendant has produced no admissible evidence to support its theory that other customer issues relate in any way to Defendant's alleged problems.  Mr. Gregory explained on cross-examination why these other customer issues were different:

> A.  Smurfit-Stone request was a thickening of their adhesive. The Green Bay Packaging complaint involved our pearl starch along with somebody else's carrier

7

> starch on a government order. And the Combined Container complaint related to a similar situation where somebody else's carrier starch was being used, without GPC having any control over formula adjustments.
> . . . . .
> A. Columbus wasn't having any problems. They were running our starch fine.
> Q. Didn't they say it was caustically sensitive?
> A. He said the latest three truck loads may have been caustic sensitive, but he was using a formula to produce the adhesive that worked for him.

(Gregory Dep. 75, 110)

The corrugating process itself has many steps and parts, each of them an opportunity for production issues unrelated to pearl starch to arise. (Aman Dep. 50–52, 120–31, 140–49) Defendant has simply loosely identified customers who had *any* issue around the time of its issues and attempted to lump them together, but has not—and could not have—demonstrated that these issues are identical.

Finally, Defendant emphasizes a communication between Mr. Brooke and Mr. Krumm in which Grain Processing represented no changes had been made in the manufacturing process at the Washington, Indiana facility. (Def. Mem. Opp. Plf. Mot. Summ. J. p. 6 [ECF Doc. 54]) Regardless of the error Mr. Brooke arguably made in his statement and regardless of the changes made in the manufacturing process, it is undisputed that all starch shipped was within both Grain Processing's specifications and Defendant's own testing specifications before use. (Aman Dep. 160–61; MacNail Dep. 27) A communication error does not mean that Grain Processing's product was faulty, and Defendant has yet to point to any evidence that shows any change in the steep time or grind rate (the factors that are alleged to have changed) would lead to faulty product. Even Defendant's expert report does not make this leap.[4]

---

[4] Even Defendant's expert was not completely certain that Grain Processing's starch caused Defendant's delamination issues. Also importantly, Defendant's expert reached this conclusion without referencing any reports from Combined Containerboard's corrugating machine service provider. (Meirowitz Dep. 105 & Ex. A to Def. Mem. Opp. Plf. Mot. Summ. J. [ECF Doc. 54])

8

As such, after considering Defendant's brief, Grain Processing is still entitled to summary judgment on Defendant's breach of warranty claim.

## II. Grain Processing Is Entitled To Summary Judgment On Defendant's Claim For Breach Of Contract Based On Price.

With respect to its second claim, Defendant has yet to—and cannot—identify a single instance where Grain Processing has offered to sell "comparable quantities of similar Products" at a price lower than the price paid by Defendant. Rather, Defendant simply argues the concepts, about which Grain Processing need not reiterate its previously stated positions, but identifies not a single actual breach. Thus, the fact remains that Defendant has not established as a matter of law that comparable quantities of similar products were sold to other customers, so Grain Processing is entitled to summary judgment on Defendant's breach of contract claim based on price provided to Defendant.

## III. Defendant Abandoned Its Claim For Transportation Costs Having Not Addressed The Issue In Its Brief.

Defendant's Memorandum in Opposition simply does not address Grain Processing's position that it is entitled to summary judgment on Defendant's claim for breach of contract regarding actual transportation costs. Accordingly, not only for the reasons set forth in Grain Processing's memorandum supporting its Motion for Summary Judgment but also because Defendant has waived this issue, Defendant's claim should be dismissed. Chic Promotions, Inc. v. Jewelers Mut. Ins. Co., 2009 U.S. Dist. LEXIS 87930, at *5–6 (S.D. Ohio Sept. 24, 2009) (Barrett, J.) ("Chic did not address its breach of contract claim in its Memorandum in Opposition to Defendant's Motion for Summary Judgment. . . . Therefore, the Court deems Chic's claim for breach of contract abandoned, and Jewelers is entitled to summary judgment on this claim.") (citations omitted).

IV. **Defendant Fails To Demonstrate That It Offered Grain Processing Notice And An Opportunity To Cure Alleged Deficiencies Or Price, Thereby Breaching The Parties' Agreement.**

As discussed above and in Grain Processing's Motion for Summary Judgment, Grain Processing is entitled to summary judgment on its own breach of contract claim. Defendant was required to give Grain Processing notice of an issue and an opportunity to cure. It is undisputed that Defendant did not allow Grain Processing to fully investigate Defendant's allegations by running a trial with Grain Processing's carrier starch. (Krumm Dep. 212, 222; Aman Dep. 209–11; Barnes Dep. 66–67)) It is also undisputed that Grain Processing was not allowed to adjust the adhesive formula since it is customary in the industry for the carrier starch provider to make the formula. (Sistrunk Dep. 128; Barnes Dep. 69–70)

Indeed, Defendant freely admits to this Court that it breached the Agreement when it says, "Greif never intended to invoke the mechanism of the meet or release clause . . . ." (Def. Mem. Opp. Plf. Mot. Summ. J. p. 12 [ECF Doc. 54]) Defendant agreed to this provision and did not abide by it with respect to the Combined Containerboard and Multicorr facilities: (1) Defendant never demanded a lower price in writing; and (2) Defendant did not allow a full opportunity to address alleged quality issues.

Defendant's now familiar selective citation continues when it claims that the operative section of the Agreement is Section 6 of the Terms and Conditions. (Id.) That provision does indeed provide:

> Notice of Defect or Breach. Purchaser may give Seller notice of any defect or breach in any reasonable manner, and any such notice will be considered timely if made within a reasonable time after discovery by Purchaser or notification to Purchaser from any of its customers.

However, Section 2 of the body of the Agreement provides:

> If Purchaser can purchase Products (i) of comparable quality at a lower delivered cost than the delivered cost of the products then in effect hereunder, (ii) of higher quality, (iii) that incorporate new technology, or (iv) with shorter lead times for delivery, ***and Purchaser gives Seller written notice thereof***, Purchaser may terminate this Agreement and/or may purchase such Products, unless within fifteen (15) days of receipt by Seller of such notice, Seller shall meet such lower delivered cost, meet the higher quality standard, incorporate the new technology or match the shorter lead times for delivery, as the case may be.

(Emphasis added). This provision afforded Grain Processing an opportunity to cure, which was not fully provided.[5] To the extent these provisions could even be said to be ambiguous, such ambiguity must be read against Defendant as the drafter, as set forth more fully in prior briefs.

Finally, to assert that Grain Processing's alleged damages are somehow fraudulent based on the fact that Grain Processing liquidated the futures positions tied to its contract with Defendant prior to Greif's breach confuses forests and trees. There is no dispute that, for business reasons unrelated to Defendant, Grain Processing sold corn futures in December 2008 related to the pearl starch intended to be sold to Defendant in 2009 and 2010. (Gregory Dep. 58; Gregory Aff. in supp. Plf. Mem. Opp. Def. Mot. Summ. J. ¶¶ 3–4 [ECF Doc. 55]) Defendant's focus on the fact that Grain Processing did not own the futures at the time of the breach and suggestion that this somehow negates any damages overlooks a very simple and undisputed fact—***Grain Processing would not have owned these futures but for the 2009–2010 Supply Agreement with Defendant***. (Gregory Aff. in supp. Plf. Mot. Summ. J. ¶ 5 [ECF Doc. 41]) Grain Processing freely acknowledges the ***amount*** it was damaged changed due to this liquidation, and before any outside lawyer had laid eyes on this dispute, Grain Processing factored that into the amount it invoiced Defendant. (Gregory Aff. in supp. Plf. Mem. Opp. Def.

---

[5] As mentioned in previous briefing, Defendant's suggestion that Jason Gregory's behavior during a telephone conference somehow caused Defendant to retain another starch supplier defies belief since all other participants in the call do not support Mr. Krumm's testimony. (Gregory Dep. 130; Barnes Dep. 38; Brooke Dep. 150–51; Ludwig Dep. 176; Aman Dep. 209)

11

Mot. Summ. J. ¶¶ 5–7 [ECF Doc. 55])  Defendant actually benefitted from this early liquidation.  But the only scenario under which Grain Processing would have had no damages related to these futures is ***if it had never entered into the 2009–2010 Supply Agreement***.  Grain Processing is still entitled to damages for the hedge loss that naturally flowed from Defendant's breach.  (Gregory Aff. in support Plf. Mem. Opp. Def. Mot. Summ. J. ¶¶ 6–7 [ECF Doc. 55])  These damages are not "fantasy" as Defendant claims; they derive from a basic principle of contract law.  A party is entitled to damages that naturally flow from a breach and to be put in a position as if the breach did not happen.  Am. Speedy Printing Ctrs., Inc. v. AM Marketing, Inc., 69 Fed. Appx. 692, 698 (6th Cir. 2003); Trebilcock v. Elinsky, 2007 U.S. Dist. LEXIS 38416, at *14 (N.D. Ohio May 25, 2007).

As set forth previously, Grain Processing is also entitled to lost profits as naturally flowing from the breach as well.

Thus, Grain Processing is entitled to summary judgment in its favor on its own breach of contract claim.

12

V.	**Conclusion**

For the foregoing reasons, Grain Processing respectfully requests that this Court grant its Motion for Summary Judgment.

	Respectfully submitted,

	/s/ William A. Nolan
	William A. Nolan (0041891) (Trial Attorney)
	C. David Paragas (0043908)
	Amy Ruth Ita (0074520)
	Barnes & Thornburg LLP
	21 East State Street, Suite 1850
	Columbus, Ohio  43215
	(614) 628-0096
	(614) 628-1433 (facsimile)
	bill.nolan@btlaw.com
	david.paragas@btlaw.com
	amy.ita@btlaw.com

	Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of October, 2011, a copy of the foregoing Plaintiff Grain Processing Corporation's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment was electronically filed and delivered to the counsel for Defendant via the Court's CM/ECF system.

	/s/ William A. Nolan